**R. T. and Gertrude WOOLSEY
and
V. G. and Elouise M. Woolsey, Plaintiffs,
v.
UNITED STATES of America,
Defendant.
Civ. A. No. 2019.**

United States District Court
S. D. Texas,
Corpus Christi Division.
Aug. 17, 1962.

Vinson, Elkins, Weems & Searls, John G. Heard, Houston, Tex., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, Myron C. Baum, Arthur L. Biggins, Attys., U. S. Dept. of Justice, Washington, D. C., Harold A. Chamberlain, Atty., U. S. Dept. of Justice, Fort Worth, Tex., Woodrow Seals, U. S. Atty., William B. Butler, Asst. U. S. Atty., Houston, Tex., for defendant.

GARZA, District Judge.

This is a suit brought by R. T. and Gertrude Woolsey and V. G. and Elouise M. Woolsey for the recovery of a total of $18,211.95, plus interest as provided by law, which was assessed and collected

from the Plaintiffs under the Internal Revenue laws of the United States for the taxable years 1955 through 1959.

The case has been presented to the Court by written stipulations and admitted facts, evidence presented at a trial, and written briefs. The Plaintiff R. T. Woolsey died after the bringing of the action, but his wife, Gertrude Woolsey, has qualified and is acting as the independent executrix of his estate. The parties have agreed as to the amount of taxes involved, to the fact that this Court has jurisdiction to hear this matter, and that the claims made by the Plaintiffs have been legally filed and within the limits of time allowed by law.

The main question presented to the Court for decision is whether the gain realized by the Plaintiffs in the years 1955 through 1959, inclusive, from their contract of August 15, 1955, with George M. Engle, is taxable as long-term capital gain to the Plaintiffs, or if such gain was ordinary income as the Government contends.

A second question presented is whether or not the Plaintiffs are entitled to report the income from such contract on the installment method under Section 453 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 453.

By the contract of August 15, 1955, with George M. Engle, the Plaintiffs claim that they sold a "management contract" which they had with a mutual insurance company; that under said contract they sold the assets of a partnership and are entitled to a capital gain. The Government, on the other hand, contends that the contract of August 15, 1955, was nothing but an anticipatory assignment of income which they were to receive for personal services, and/or represented a commission paid in connection with the reinsurance of Gulf Security Life Insurance Company policies with Austin Life Insurance Company, and is taxable as ordinary income.

It is undisputed that the Plaintiffs had a "management contract" with Gulf Security Life Insurance Company. The "management contract" under which R. T. and V. G. Woolsey were operating was entered into by and between them and Gulf Security Life Insurance Company on July 6, 1949, and was to be in effect for a period of 25 years.

Basically there are two types of life, health and accident insurance companies existing in Texas. These are capital stock companies and mutual assessment companies. The promoters or organizers of insurance companies are not interested in promoting either type of insurance company unless they can maintain control of the company for a reasonable length of time. Organizers or promoters of stock companies can retain control of the same as long as they own the majority of the stock. By owning the majority of the stock they can elect themselves to the board of directors, and then officers of the company, and always have control of the same. In mutual assessment companies, this cannot be done because the ownership of the company is vested in the policy-holders who, in effect, are in the position of share-holders. As more policies are written, there are more owners and more people with the right to vote; and the organizers and promoters have no way to assure themselves of control over the company.

To assure the organizers and promoters of a mutual assessment company that they will retain control of the company, a means has been devised of entering into "management contracts". Such a "management contract" was the one that the Plaintiffs in this case had with Gulf Security Life Insurance Company and that they are claiming was sold to Engle for $171,500.00.

Under the usual "management contract" an agreement is made between the mutual insurance company and the management group, providing that for a specified number of years the management group is granted control over the operation of the insurance company. The premiums paid by the policyholders of a mutual insurance company are by State law divided into two general classifica-

tions. A part of these premiums is put in a Mortuary Fund and the balance in a General Fund. The management group (in this case the Woolseys) would, from the premiums paid and put in the General Fund, pay the expenses of the operation of the company and they would then be entitled to the balance as their fee for managing the company. The more policies that are sold and the bigger the company gets, the more money there is available to the General Fund, and the more possibility of a profit being made from the operation of the company.

The Woolsey brothers, R. T. and V. G., commenced in the insurance business in Corpus Christi, Texas, in 1928, as managers of a local mutual aid association called the Gulf Security Association, which had the right to sell insurance policies within a 100-mile radius of Corpus Christi, Texas.

In 1943, R. T. and V. G. Woolsey purchased from F. D. Glass, Jr., a "management contract" between Texas Independent Life Insurance Company (the name of such company having been changed previously to Home Security Life Insurance Company) and Glass, together with that company's charter to sell insurance on a statewide basis, and certain other assets. R. T. and V. G. Woolsey paid $6,500 to Glass for the transfer of these assets. After the acquisition, the Home Security Life Insurance Company was merged with the Gulf Security Association and the name was changed to Gulf Security Life Insurance Company which will at times be hereinafter referred to as Gulf Security.

As a result of the charter acquired from Glass, R. T. and V. G. Woolsey were authorized to sell insurance on a statewide basis, rather than being limited to the 100-mile radius from Corpus Christi.

As a result of the "management contract" acquired from Glass, R. T. and V. G. Woolsey became the managers of the entire business operations of Gulf Security. The business of carrying out the management activities was conducted in a partnership called Gulf Security Life Insurance Co., in which R. T. Woolsey and his brother, V. G. Woolsey, each had a 50% interest.

In accordance with state law, 60% of the total premiums paid by the various policyholders of Gulf Security was allocated to the General Fund and 40% of such premiums was allocated to the Mortuary Fund. The General Fund was allocated to and belonged to the management partnership (Gulf Security Life Insurance Co.), and out of such fund the managers were obligated to pay all operating expenses of the corporation (Gulf Security). Thus, the net profit to the managers was the excess of the amount allocated to the General Fund over and above the expenses that had to be paid therefrom. The amount allocated to the Mortuary Fund was invested and the income therefrom inured solely to the benefit of the Mortuary Fund. The only payments out of the Mortuary Fund were for death benefits payable to members owning insurance policies issued by the company.

On July 6, 1949, the "management contract" between Gulf Security and R. T. and V. G. Woolsey was renewed and extended with similar provisions as the contract acquired from Glass for a term of 25 years from that date. This contract provided, as did the prior contract acquired from Glass, that R. T. and V. G. Woolsey would own all office furniture, equipment, fixtures and all records of the company. This contract was made in accordance with the by-laws of Gulf Security.

The partnership, Gulf Security Life Insurance Co., filed with the District Director of Internal Revenue at Austin, Texas, or his predecessor in office, Federal partnership returns of income for each of the years 1943 through 1955, inclusive. These returns reported in full the income allocated to the General Fund and belonging to the management partnership in accordance with the "management contract", and deducted therefrom all expenses paid in connection with operating Gulf Security, together with a deduction for depreciation attributable

to the physical assets used in connection with the operations and for amortization of the cost of the statewide charter. The partnership return of income filed for 1954 was examined by the Internal Revenue Service and accepted as filed, without change.

The corporation, Gulf Security Life Insurance Company, filed life insurance Federal income tax returns (Forms 1120 L) for the years 1949 through 1954, inclusive, reporting thereon all of the items of income and deductions attributable to the Mortuary Fund. These returns were also accepted as filed by the Internal Revenue Service.

After approximately a quarter of a century of the partnership operating the insurance company both R. T. and V. G. Woolsey wanted to get out from under the responsibilities of it. Further, they both felt that the policyholders of the Gulf Security Life Insurance Company, the insurance corporation the partnership was operating, would be better protected in a legal reserve company. Accordingly, they were interested in selling their partnership business.

Prior to August 15, 1955, negotiations were entered into between R. T. and V. G. Woolsey, on their own behalf, and H. N. Miller, representing Austin Life Insurance Company, a Texas insurance corporation, for the sale of the partnership business of Gulf Security Life Insurance Co., including the "management contract" with Gulf Security, the statewide charter, all physical assets used in connection with the management of Gulf Security and all of the goodwill of the business.

As these negotiations were coming to a successful conclusion, Austin Life indicated that Mr. George M. Engle would make the purchase instead of Austin Life.

On August 15, 1955, R. T. and V. G. Woolsey entered into a contract with George M. Engle whereby they sold to Engle all of the assets and business of and all their interest in the partnership, Gulf Security Life Insurance Co.

As a result of the contract of August 15, 1955, R. T. and V. G. Woolsey sold to George M. Engle their respective partnership interests in the partnership called Gulf Security Life Insurance Co., and the consideration received by R. T. and V. G. Woolsey under such contract represented proceeds from the sale of such partnership interests. All of the partnership properties were sold to Engle.

The partnership owned no right to any renewal commission on insurance written. Both R. T. and V. G. Woolsey owned rights to renewal commission for insurance previously written by them individually, but such rights did not belong to their partnership, Gulf Security Life Insurance Co., and consequently were not sold to Engle as the partnership interests were. R. T. and V. G. Woolsey always reported these renewal commissions on their own individual income tax returns.

As the partnership had no earned but unrealized receivable or no substantially appreciated inventory, none was conveyed to Engle by this sale.

While the sale by R. T. and V. G. Woolsey of their respective partnership interests was made to Engle, they would have sold under the same terms directly to Austin Life, but for reasons of its own Austin Life did not make an offer.

At the time of its sale, the partnership, Gulf Security Life Insurance Co. was a going concern.

In addition, each of the individual assets making up the partnership, all of which became the property of Engle as a result of his purchase from R. T. and V. G. Woolsey, constituted either capital assets or depreciable property used in the trade or business of the partnership.

Also on August 15, 1955, Engle entered into an agreement with Austin Life Insurance Company and a separate agreement with Gulf Security Insurance Agency, a partnership, in which neither R. T. nor V. G. Woolsey had any interest.

In the agreement between Engle and Austin Life, Engle agreed to use his best

efforts to bring about the reinsurance by Austin Life of all the outstanding life insurance policies of Gulf Security Life Insurance Company. If Engle was successful in bringing about such reinsurance, Austin Life agreed to pay him an amount in excess of the consideration that Engle had agreed to pay to R. T. and V. G. Woolsey under his contract with them.

In the contract between Engle and Gulf Security Insurance Agency, Engle agreed in the event of the reinsurance of the Gulf Security policies by Austin Life to convey the "management contract", statewide charter, goodwill and records pertaining to the health and accident policies of Gulf Security to the Gulf Security Insurance Agency. The agreement further provided that if Engle was unsuccessful in his attempts to get approval of the reinsurance of the Gulf Security policies by Austin Life, Gulf Security Insurance Agency had an option to buy the "management contract", statewide charter and goodwill, together with the furniture and equipment and operating records acquired by Engle in his purchase of the partnership interests of R. T. Woolsey and V. G. Woolsey. In the latter instance, the consideration to be paid by Gulf Security Insurance Agency was the same as the consideration to be paid by Engle to R. T. and V. G. Woolsey.

Any amounts to be received by Engle under the contracts with Austin Life and the Gulf Security Insurance Agency were pledged to R. T. and V. G. Woolsey as security for the performance of Engle's obligations to them.

From August 15, 1955, until October 1, 1955, Engle remained as owner of what had been the partnership Gulf Security Life Insurance Co. business, and reported the earnings from such business for this period in his individual income tax return for 1955. On October 1, 1955, the life insurance policies of Gulf Security were reinsured by Austin Life, pursuant to the contract between Austin Life and Engle of August 15, 1955, and pursuant to the approval of the members and policyholders of Gulf Security on September 30, 1955.

Mr. R. T. Woolsey and Mr. V. G. Woolsey took no part in the actual negotiation of the reinsurance agreement between Austin Life and Gulf Security.

The remaining assets of what had been the partnership Gulf Security Life Insurance Co. were then conveyed by Mr. Engle to the Gulf Security Insurance Agency. The Gulf Security Insurance Agency was a partnership composed of officers and others interested in the Austin Life Insurance Company.

Austin Life paid Mr. Engle $22,600 in cash and the balance of the payments due Mr. Engle under the contract with Austin Life were paid directly by Austin Life to Messrs. R. T. and V. G. Woolsey, in accordance with the assignment of such amounts by Mr. Engle as security for his obligations to Messrs. R. T. and V. G. Woolsey under their contract dated August 15, 1955.

Plaintiffs, in their respective income tax returns for 1955, properly elected to report their gain from the sale to Engle on the installment basis in accordance with Section 453 of the Internal Revenue Code of 1954, and treated the pro rata portion of such gain reported in each of the years 1955 through 1959, inclusive, as long-term capital gain.

Defendant, on examination of the respective joint income tax returns of the Plaintiffs, treated the gain from the sale to Engle as ordinary income rather than capital gain, and computed the gain on a "cost-recovery" basis rather than on the installment method. As a result, Defendant asserted the tax deficiencies which are the subject of this suit for refund, and such deficiencies were duly paid by the Plaintiffs and claims for refund filed. Such claims were denied by Defendant.

The Government contends that Engle was nothing but a straw man for Austin Life Insurance Company, and that the Plaintiffs received the sum of $171,500.-00 as a commission for their services in getting the policies of insurance of Gulf

Security Life Insurance Company reinsured by Austin Life.

To support their position, they ask the Court to look at all of the contracts entered into in connection with the Engle transaction. They maintain that under the authority of Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, the Government can look at a transaction as a whole and disregard the effect of any fiction created by the contract; that under the by-laws of Gulf Security Life Insurance Company, and Section XIII thereof which reads as follows:

"SECTION 13. MANAGERIAL SERVICE: The Board of Directors is authorized by majority action to enter into a General Agents or General Managerial Service contract with any suitable person or persons looking to the management and operation of the business of the corporation, and to make contracts with such person or persons, including the present officers, for the remuneration payable to them."

what the Woolseys were to receive from the General Fund was nothing but remuneration for personal services; and that their position that they had a partnership business separate and apart from the business operation of Gulf Security Life Insurance Company is not supported by the evidence; that under the "management contract" claimed to have been sold to Engle, the Woolseys did not own the General Fund of Gulf Security Life Insurance Company, but were in truth and in fact selling something that Gulf Security Life Insurance Company owned.

With this contention of the Government, this Court cannot agree. The "management contract" itself is a valuable asset. As long as said "management contract" was in existence, no one could operate the company but the holder of the contract. It should be realized what whoever has the "management contract" also has the greatest influence on the policyholders, for they are the ones that send out notices of policyholder meetings and ask that those that cannot attend send them their proxies, and in that way they can control the actions to be taken at annual meetings, and the election of directors and officers. Even if the contention of the Government that the transaction between the Woolseys and Engle was nothing but a scheme to get the policies of Gulf Security Life Insurance Company reinsured by Austin Life, Austin Life could never have accomplished this as long as the Woolseys had the "management contract" of July 9, 1949, for they would have surely and strenuously objected to such reinsurance as that would have stopped all moneys coming into the General Fund of Gulf Security Life Insurance Company.

So, instead of agreeing with the Government that the Woolseys had nothing to sell, and that the payment under the Engle contract represented a commission paid in connection with the reinsurance of Gulf Security policies with Austin Life Insurance Company, we have to conclude that in order for Austin life to do this, it was necessary for them to divest the Woolseys of their "management contract", and therefore they had to purchase it, which they did through Engle. If they had not purchased the "management contract" from the Woolseys, they could never have gotten to reinsure the Gulf Security policies.

I, therefore, conclude that the Plaintiffs in this case, under the contract of August 15, 1955, sold a partnership business and all the constituted assets of the same, and mainly the "management contract" with Gulf Security, gain from the sale of which is long-term capital gain for Federal income tax purposes under Section 741, Title 26, U.S.C.A.; and that they are entitled to their refund, and are also entitled to report the same on the installment method under Section 453 of the Internal Revenue Code of 1954.

I hold that a sale by a partnership of a "management contract" with a mutual insurance company in Texas, is the sale of a capital asset under Section 741, Title 26 U.S.C.A., and I agree with

the conclusions of law reached by the Court in Eidson, et al. v. United States, 61–2 U.S.T.C. 9668, 8 A.F.T.R. (2) 5495.

As stated at the outset of this opinion, organizers and promoters of mutual life insurance companies in Texas have devised the scheme of the "management contract" to retain control over the companies that they organize. The "management contract" is of as much value as the owning of the majority of the stock in a stock company. Whoever owns the "management contract" controls the company, and it is for this reason that the same is a valuable asset to own, and a person that owns it has as much right to the claim for a capital gain as does the holder of the majority of the stock in a stock company when he disposes of his stock after the insurance company that he helped organize and promote has grown and prospered.

This memorandum opinion will constitute my Findings of Fact and Conclusions of Law.